# IN THE COURT OF APPEALS OF IOWA

No. 24-0019
Filed October 30, 2024

IN RE THE MARRIAGE OF BRITTNEY R. CHAPMAN
AND JEREMY R. ECKARD

Upon the Petition of
**BRITTNEY R. CHAPMAN ECKARD, n/k/a BRITTNEY R. CHAPMAN,**
    Petitioner-Appellee,

And Concerning
**JEREMY R. ECKARD,**
    Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Dickinson County, Carl J. Petersen,

Judge.


        The respondent challenges provisions in the parties' dissolution decree.

**AFFIRMED AND REMANDED.**


        Edward W. Bjornstad of Bjornstad Law Office, Spirit Lake, for appellant.

        Matthew T.E. Early of Matthew Early Law Office, Spirit Lake, for appellee.


        Considered by Tabor, C.J., Langholz, J., and Potterfield, S.J.*  Sandy, J.,

takes no part.

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**POTTERFIELD, Senior Judge.**

Jeremy Eckard appeals the decree dissolving his marriage to Brittney Chapman (formerly Brittney Chapman Eckard). Jeremy challenges the property distribution, the specifics of the "right of first refusal" provided in the decree, and the court's order regarding uncovered medical expenses for the parties' two children. Brittney asks that we affirm the decree and order Jeremy to pay $5000 of her appellate attorney fees. "We review dissolution cases de novo." *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006).

**I. Property Distribution.**

After identifying the parties' marital property, determining the values, and assigning the property to one party or the other, the court determined that Brittney was receiving $33,042 worth of marital property while Jeremy received $112,644. Dividing the difference in half, the court ordered Jeremy to pay Brittney $39,801 as an equalization payment. Here, Jeremy challenges the property division, arguing the district court should have (1) used the certified appraisal to determine the value of the family home and (2) divided Brittney's pension pursuant to the *Benson* formula[1] rather than placing the "refund value"[2] as an asset on Brittney's side of the ledger.

---

[1] *In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996) (providing a formula to divide a defined benefit plan for the purposes of marital property settlement, which considers the percentage of the pension attributable to the parties' joint marital efforts).

[2] *See* Iowa Code § 97B.53 (2023) (providing "refund options" following termination of employment by IPERS members).

**A. Home Value.**

At trial, Jeremy introduced evidence of a certified appraisal conducted on the family home, which gave $310,000 as the value of the home. Brittney introduced an evaluation completed by a local realtor who visited the property, which gave $342,250 as the home's value. The district court concluded both "appear[ed] to be reasonable" and averaged the two to reach its own value for the purpose of the property distribution—$326,125. Jeremy contests this value, broadly arguing that a certified appraisal should receive more evidentiary weight than a "suggested list price" provided by a realtor.

"Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence." *In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007). "Although our review is de novo, we ordinarily defer to the trial court when valuations are accompanied by supporting credibility findings or corroborating evidence." *Id.* While Jeremy suggests the type of evidence he introduced is more worthy of being relied upon, like the district court we think both valuations are reasonable. Determining a property's fair and reasonable value is not an exact science—valuation is in the realm of opinion. *See Naumann v. Iowa Prop. Assessment Appeal Bd.*, 791 N.W.2d 258, 262 (Iowa 2010) (discussing property valuations by a county board of assessment). And here, both the appraiser and the realtor used comparable sales in the area to reach a value and even used some of the same sales in making their determinations. And each provided a report that supported the value they determined was appropriate.

Because the value determined by the district court is within the permissible range of the evidence presented at trial, we will not disturb it.

**B. Brittney's IPERS.**

Next, Jermey argues that Brittney's IPERS pension should have been divided according to the *Benson* formula rather than awarding Brittney the refund value of $20,460 as an asset in the property distribution. We recognize "it is normally desirable to divide a defined-benefit plan," as IPERS is, "by using the percentage method," i.e. the *Benson* formula. *Sullins*, 715 N.W.2d at 248–49.

But here, the parties included the IPERS account in their pretrial stipulation as an asset worth $20,460 that Brittney would receive. And Jeremy confirmed this position during his testimony, when he asked the court to "grant to Brittney all of her IPERS." After the court did as requested, Jeremy filed a motion to enlarge, wherein he wrongly claimed, "The Court failed to include Brittney's IPERS contained on the pretrial stipulation as part of the settlement calculation." Jeremy did not advocate that the pension should be divided by the percentage method.

Jeremy cannot now take a position on appeal that is different than the position he took at the district court. Insofar as the district court's distribution of Brittney's IPERS pension was in error, Jeremy acquiesced to that error. *See, e.g.*, *Jasper v. State*, 477 N.W.2d 852, 856 (Iowa 1991) (noting one "cannot deliberately act so as to invite error and then object because the court has accepted the invitation"); *McCracken v. Edward D. Jones & Co.*, 445 N.W.2d 375, 378 (Iowa Ct. App. 1989) ("[I]t is elementary a litigant cannot complain of error which he has invited or to which he has assented."). We do not consider this issue further.

**II. Right of First Refusal.**

Jeremy asked the district court to include in the decree a "right of first refusal" provision or "[t]he right of a parent to be offered the opportunity to have

[care] of a child other than during a usual [parenting] period before the other parent turns to a third-party caregiver." *Right of First Refusal*, *Black's Law Dictionary* (12th ed. 2024). Brittney agreed to the provision but asked the court to set a minimum period, so the right of first refusal would be limited to instances when the person with parenting time was unable to care for the children for at least four hours. The court agreed with this limitation, putting in the decree that "the right of first refusal for care must be based upon the parent's absence for more than four hours." Jeremy challenges this limitation, arguing he should have the right of first refusal *any* time Brittney is unable to provide care for the minor children.

"The 'right of first refusal' arises from the principle that a parent has a fundamental interest in caring for a child." *Cook v. Noriega*, No. 16-1584, 2017 WL 4315053, at *6 (Iowa Ct. App. Sept. 27, 2017). The primary consideration in determining whether to grant a right of first refusal and then, if granted, in fashioning that right, is the best interests of the children. *In re Marriage of Klemmensen*, No. 14-1292, 2015 WL 2089699, at *3 (Iowa Ct. App. May 6, 2015).

As the district court recognized, these parents have a difficult time communicating. Removing the minimum period before the right of first refusal takes effect would increase the amount of communication needed between the two parties and would require more exchanges of the children. *See Dirks v. Eccles*, No. 19-0994, 2020 WL 2071116, at *4 (Iowa Ct. App. Apr. 29, 2020) (rejecting a right-of-first-refusal provision when it would "complicate matters and create stress and animosity between the parties"). It could also be used by "the parties to monitor when and why the other parent is away from the children and to manipulate schedules to maximize parenting time instead of acting in the children's best

interests." *In re Marriage of Johnsen*, No. 20-0779, 2021 WL 2690019, at *4 (Iowa Ct. App. June 30, 2021); *accord id.* (rejecting request to modify right of first refusal to take effect at four hours rather than twenty-four as set by the district court). This is not in the children's best interests. We decline to modify the right-of-first-refusal provision.

## III. Uncovered Medical Expenses.

Jeremy complains he was ordered to pay 100% of the children's uncovered medical expenses; he maintains the expenses should have been apportioned in proportion to the parties' respective incomes. *See* Iowa Ct. R. 9.12(5).

Here, the district court concluded the parties had nearly equal incomes, with Brittney earning $54,423 annually and Jeremy earning $52,000. Brittney was ordered to provide health insurance, as she had it available through her employer. Noting the similar incomes and the award of joint physical care, the district court concluded a deviation from the child-support guidelines was appropriate and declined to order Jeremy to pay child support.[3] Then, based on all the above, the court concluded Jeremy would be responsible for 100% of the uncovered medical expenses rather than apportioning them between the parents. Jeremy asked the district court to reconsider this ruling in a post-trial motion, which the district court denied, concluding: "The Court's decision to not order child support, require

---

[3] The court recognized that Jeremy would be required to pay Brittney "minimal child support" since she provides vision, dental, and health insurance; it stated it would file a child support guideline worksheet supporting this statement. We have not found the court's worksheet in the record. But a worksheet filed by Brittney and using the correct incomes shows Jeremy would be required to pay her $156.49 each month.

[Brittney] to pay health insurance and [Jeremy] cover the noncovered expenses was equitable and most likely financially advantages to [Jeremy]."

Rule 9.12(5) defines "uncovered medical expenses" and provides, "In cases of joint physical care, the parents will share all uncovered medical expenses in proportion to the parents' respective net incomes." "While 'shall' imposes a duty, the district court is allowed to deviate where appropriate as long as [it gives] a written reason." *In re Marriage of Cooley*, No. 20-1501, 2021 WL 4592832, at \*4 (Iowa Ct. App. Oct. 6, 2021); *see also In re Marriage of Friest*, No. 18-0337, 2019 WL 1300881, at \*5 (Iowa Ct. App. Mar. 20, 2019) (recognizing the district court can deviate from the guidelines regarding uncovered medical expenses when it justified and appropriate and the court states its reasons for the variance).

Considering all of the factors relied on by the district court, we conclude the variance was justified and appropriate; we affirm the district court's requirement that Jeremy pay 100% of the uncovered medical expenses.

## IV. Appellate Attorney Fees.

Brittney asks that we order Jeremy to pay $5000 of her appellate attorney fees.

> Appellate attorney fees are not a matter of right, but rather rest in this court's discretion. Factors to be considered in determining whether to award attorney fees include: "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."

*Sullins*, 715 N.W.2d at 255 (citation omitted).

While the parties earn nearly equal salaries, Brittney has been wholly successful in this appeal, which she was required to defend. We conclude she is entitled to an award of some of her appellate attorney fees. "But because she has

not provided an affidavit of attorney fees with documentation to support her request, we remand to the district court to determine the amount of [Brittney's] appellate attorney fees and enter judgment against [Jeremy] in a reasonable amount." *In re Marriage of Kisting*, 6 N.W.3d 326, 338 (Iowa Ct. App. 2024).

We affirm the dissolution decree entered by the district court; we remand for the district court to determine a reasonable award of appellate attorney fees for Brittney.

**AFFIRMED AND REMANDED.**